**Michael L. HARRIS, Appellant–Petitioner,**

v.

**STATE of Indiana, Indiana Parole Board, Indiana Department of Correction, Appellees–Respondents.**

No. 43A05–0502–PC–80.

Court of Appeals of Indiana.

Oct. 18, 2005.

Transfer Denied Dec. 15, 2005.

Michael L. Harris, New Paris, Appellant Pro se.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Petitioner Michael L. Harris ("Harris") appeals the post-conviction court's denial of his petition for post-conviction relief, which had alleged that the Indiana Parole Board ("the Board") improperly revoked his parole. We affirm.

### Issues

Harris raises five issues on appeal, which we consolidate and restate as whether the post-conviction court erred by denying his petition for post-conviction relief because:

I.  In imposing the special conditions at issue, the Board failed to comply with Indiana Code Sections 11–13–3–4 and 4–22–2–19.5;

II.  In revoking his parole, the Board deprived Harris of the due process rights outlined in *Morrissey v. Brewer,* 408 U.S. 471, 478, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972);

III.  The evidence is insufficient to revoke his parole under Indiana Code Section 11–13–3–10; and

IV.  The parole revocation deprived Harris of his earned credit time.

### Facts and Procedural History

On or about February 26, 1999, Harris pleaded guilty to one count of child molesting, a Class B felony,[1] for his sexual conduct with a ten-year old boy. On April 29, 1999, the trial court sentenced Harris to ten years in the Indiana Department of Correction for his child molesting conviction. While incarcerated, Harris earned an associate's and a bachelor's degree in general studies. On November 6, 2002, Harris was released on parole.

Prior to his release, on October 30, 2002, Harris executed the Conditional Parole Release Agreement ("Agreement"), which contained the following provisions: "10. *Communication and Special Instructions* ... I will abide by any special conditions imposed by the Indiana Parole Board which have been reduced to writing and

---

1. Ind.Code § 35–42–4–3.

included as a condition of my parole." Appellant's App. at 48 (capitalization omitted). That same day, Harris also signed the "Special Parole Stipulations for Sex Offenders," wherein the Board imposed the following, relevant, "special stipulations" upon Harris:

3. You shall not use any computer with access to any "on-line computer service" at any location (*including place of employment*) without the prior approval of your parole agent. This includes any Internet service provider, bulletin board system, e-mail system or any other public or private computer network.

\* \* \* \* \*

12. You shall not use your employment as a means to acquire new victims. Your parole agent may contact your employer at any time. You will not work in certain occupations that involve being in the private residence of others, such as, but not limited to: door-to-door sales, soliciting, or delivery. Your parole agent must first approve any employment that you do engage in.

13. You shall not possess any items on your person, in your vehicle, in your place of residence or as a part of your personal effects, that attract children, or that may be used to coerce children to engage in inappropriate or illegal sexual activities. You will not engage in any activities that could be construed as enticing children.

*Id.* at 50–51 (emphasis in original). Beside each of these conditions appears the initials "SUD," or "signed under duress." Tr. at 23. In addition, Harris signed the "Standard Parole Stipulations for Sex Offenders," which contained, in relevant part, the following condition: "You shall have only one residence and one mailing address at a time." *Id.* at 49.

While on parole and subject to these special and standard conditions, Harris began working as a casting director at "Michael L. Harris Film Productions" ("MLH Media")—a film and video production company that he had incorporated prior to his molestation conviction. Appellant's App. at 136. As a casting director, Harris wrote Barbara Patton ("Patton") a letter, which provides, in pertinent part:

You have been a life saver so far and I am looking forward to working with you and hopefully getting some Indiana projects off the back-burners and on to the heat, enclosed are: The complete script for *Autopsy*, a cast breakdown, including but not for production, projected budget for the cast.

\* \* \* \* \*

Drop Page   ☺   New Project:

You are probably confused by now with the various projects I have on the plate. This is project two which we also spoke about briefly. This involves two boys as main characters as well as featured roles for an old man... and a mother ..... The leads [sic] a 15–18 year old is a peer-rejected, kid from the wrong side of the tracks. After an unsuccessful attempt to find a real job he takes a job babysitting some rich people's kid. The kid wants in (to Byron's life) Byron wants out. The tag line is: Byron a 15–year [old] must decide whether to leave his troubled life behind opting instead for a storybook ... life of ease on the open road or to face his life head-on healing both himself and young Charlie his babysitting charge.

\* \* \* \* \*

Last project for now:

I need a co-writer for a very politically sensitive topic. The project "Victims" deals with an occurrence of sexual molestation, between a man and a boy. The piece is a reflection of the experience from both POV's. This is not a stranger abduction thing but based on a situation that occurred out of a long term relationship that had many positives.... My target age for co-writer is 18–23. With a solid head on his shoulders who can add a perspective that may or may not reflect society's current position. It is an honest exploration of a topic that is too frequently stereotyped into a hysterical phobia. I want an honest exploration of the issues. TOO HOT TO Handle or can you help me out? You mentioned a guy name[d] Chris, still a good prospect? Or not?

*Id.* at 58–59.

On August 11, 2003, the State filed a parole violation report against Harris, wherein it alleged several violations, including: (1) unauthorized use of the Internet; (2) advertising a video in an attempt to entice children; (3) engaging in unapproved employment, and (4) maintaining more than one residence and one mailing address at a time. The report alleged, for example, that Harris—who is only permitted to use the Internet for work purposes [2] —has been using e-mail for non-work-related communications and maintaining a website on which he "sells movies he makes, asks people to submit headshots and resumes, advertises talent workshops, and asks people to join his website." *Id.* at 34. With respect to Harris's use of the Internet, the report also alleged: "[Harris] stated that he knew he was not allowed to use the internet for other than Light House production, his place of employment." *Id.* at 35.

In regard to the second allegation of a parole violation, the report provides:

[Harris] advertises a video he made called the "Old Ball Game". He calls it an examination of peer acceptance/rejection. He says it is an attempt to develop local actors. The children are between 6–18 years of age. [Harris] has produced a film for sale called ["]GOD'S CHILDREN". [Harris] markets this film as a way to impress youth Pastors.

*Id.* As for the third allegation—that Harris engaged in unapproved employment—the report contained the following information:

[Harris] contacted a casting director named [Patton.] He told her he was producing a film called AUTOPSY. This film called for [approximately] 90 child actors. [Harris] did not tell [Patton] that he was a convicted sex offender. [Harris] asked [Patton] to send him actors to interview for this film as he stated he was a producer. [Patton] stated that seven actors were sent to [Harris] to interview before she found out that [Harris] was a convicted sex offender. [Patton] stated that two of the actors were under 18 years of age.... The following are some quotes from [Harris's] letter to the casting agent [Patton].... "The leads a 15–18 year old is a peer-rejected kid from the wrong side of the tracks. After an unsuccessful attempt to find a real job he takes a job baby sitting some rich people's kid." He goes on "It has some of the best lead roles for kids this age I have ever seen. It's called "Don't Play Dead before you have to!." [Harris] talks about another script "I need a co-writer for a very politically sensitive topic. The project

---

**2.** In addition to his work with MLH Media, Harris also works for a company known as "Lighthouse Video Productions." Appellant's App. at 96. Harris received approval to use the Internet for "Light House work purposes only." *Id.* at 34.

"Victims" deals with an occurrence of sexual molestations, between a man and a boy." [Harris] was convicted of molesting a grade school age boy.... [Harris] was not given permission to produce films or interview actors.

*Id.* Lastly, and with respect to the fourth alleged parole violation, the report discloses that Harris resides at 70600 County Road #23 in New Paris, Indiana and maintains a P.O. Box in Syracuse, Indiana, as well as an e-mail address.

On October 3, 2003, after conducting a preliminary hearing, the Board voted to revoke Harris's parole, determining that the four allegations were true. On February 2, 2004, this Court granted Harris permission to file a successive petition for post-conviction relief and, on February 11, 2004, Harris refiled his successive petition for post-conviction relief. On May 27, 2004, the post-conviction court held a hearing, at which Harris appeared pro se. At the conclusion of the hearing, the post-conviction court denied Harris's petition for post-conviction relief. Harris now appeals.

**Discussion and Decision**

*I. Standard of Review*

Because Harris is challenging the revocation of his parole, his petition is properly before us as a petition for post-conviction relief. *See Parker v. State,* 822 N.E.2d 285, 286 (Ind.Ct.App.2005). As such, he bears the burden of establishing the grounds for relief by a preponderance of the evidence. *Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993), *reh'g denied.* On appeal from the denial of post-conviction relief, we will reverse a post-conviction court's decision only where the evidence is without conflict and "leads unerringly and unmistakably to a decision opposite that reached by the trial court." *Prowell v. State,* 741 N.E.2d 704, 708 (Ind.2001). Stated differently, we will disturb a post-conviction court's decision only where the evidence is uncontradicted and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Miller v. State,* 702 N.E.2d 1053, 1058 (Ind.1998), *reh'g denied, cert. denied,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000). We accept the post-conviction court's findings of fact unless they are clearly erroneous, but we give no deference to the court's conclusions of law. *State v. Van Cleave,* 674 N.E.2d 1293, 1295–96 (Ind.1996), *reh'g granted on other grounds,* 674 N.E.2d 1293, *cert. denied,* 522 U.S. 1119, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998).

*II. Parole: An Overview*

The practice of releasing prisoners on parole has become an integral part of the penological system. *See Morrissey v. Brewer,* 408 U.S. 471, 478, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "Rather than being an ad hoc exercise of clemency, parole is an established variation on imprisonment of convicted criminals." *Id.* The primary purpose behind parole "is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." *Id.* It also serves to alleviate the costs to society of keeping an individual in prison. *Id.* To accomplish the purpose of parole, persons allowed to leave prison early—i.e., before the completion of sentence—are subjected to specified conditions for the duration of their terms. "These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Id.*

In Indiana, a prisoner is released on parole only upon his or her agreement to certain conditions. *United States v. Franklin,* 440 F.2d 1210, 1212 (7th Cir. 1971) (applying Indiana law). A parole

agreement is a contract between the prisoner and the State and may be subject to certain conditions imposed at the time of the granting of parole. 22 INDIANA LAW ENCYCLOPEDIA, *Pardon and Parole* § 6, at 383 (2003). Accordingly, where conditions have been imposed, the parolee is bound by such conditions. *Id.*

■ Generally speaking, the Board has the power to determine whether prisoners serving an indeterminate sentence should be released on parole and, if so, under what conditions.[3] *Id.* This power is conferred by statute. A condition to remaining on parole, for example, is that the parolee not commit another crime during the period of parole. *See* Ind.Code § 11–13–3–4(a). The Board may also adopt, under IC 4–22–2, additional conditions to remaining on parole and require a parolee to satisfy one or more of these conditions. Ind.Code § 11–13–3–4(b). These conditions, however, must be reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right. *Id.*

Moreover, by statute, the Board may require a parolee to reside in a particular geographic location and may require the parolee to periodically submit to a laboratory chemical test or series of tests that detect and confirm the presence of a controlled substance. Ind.Code §§ 11–13–3–4(e), –4(f). In addition, and with respect to certain sexual offenders such as Harris, the Board *may* require a parolee to participate in a treatment program for sex offenders and avoid contact with any individual less than sixteen years of age unless the parolee either receives the Board's approval or has successfully completed the treatment program. Ind.Code § 11–13–3–4(g). In addition, the Board *must* require a "sex and violent offender" parolee to register as a sex offender, refrain from residing within one thousand feet of school property for the duration of parole, and refrain from residing within one mile of the victim of the offender's sex offense. *Id.*

■ If the Board releases a prisoner on parole, the parolee must be given a written statement of the conditions of his or her parole. *See* Ind.Code § 11–13–3–4(c). Further, signed copies of the statement must be: "(1) retained by the parolee; (2) forwarded to any person charged with the parolee's supervision; and (3) placed in the parolee's master file." *Id.* The parolee's signature, however, is not a prerequisite to the enforceability of the parole agreement where the parolee was advised of the terms and received the benefits of the release agreement.[4] *See Page v. State,* 517 N.E.2d 427, 429 (Ind.Ct.App.1988), *trans. denied.* The Board may revoke a person's parole pursuant to the provisions of Indiana Code Section 11–13–3–8.

### III. Analysis

On appeal, Harris argues that the trial court erred by denying his petition for post-conviction relief because the Board had improperly revoked his parole. Specifically, Harris contends that: (1) the spe-

---

3. Because Harris was a Class I prisoner—which gave him one day of credit time for each day he was imprisoned pursuant to Indiana Code Section 35–50–6–3(a)—and had earned an associate's and bachelor's degree—earning him additional years of credit time under Indiana Code Sections 35–50–6–3.3(a), –3.3(d), and –3.3(i)—he received parole on November 6, 2002. That said, Harris was still subject to the parole conditions imposed upon him by the Board pursuant to Indiana Code Section 35–50–6–1(b).

4. Indeed, because Harris's signature was not essential, for our purposes, it is irrelevant that Harris allegedly signed the parole agreements under protest.

cial conditions attached to his parole—which prevented him from using the Internet, engaging in unapproved employment, acting in a manner that entices children, and having more than one mailing address at a given time—were improperly enacted under Indiana Code Sections 11–13–3–4 and 4–22–2–19.5; (2) the revocation of his parole did not comply with the procedural mandates delineated in *Morrissey*, 408 U.S. at 478, 92 S.Ct. 2593; (3) the evidence presented at the revocation hearing did not support the revocation of his parole under Indiana Code Section 11–13–3–10; and (4) the revocation deprived him of his earned credit time. We separately address each argument.

### A. The Board's Authority to Impose the Special Conditions

Harris first asserts that his parole was improperly revoked because the Board failed to properly enact the special condi-

tions at issue pursuant to Indiana Code Sections 11–13–3–4 and 4–22–2–19.5. We examine each argument, in turn.

### 1. Propriety of the Conditions under Indiana Code Section 11–13–3–4(b)

Indiana Code Section 11–13–3–4(b) allows the Board to impose additional conditions to remaining on parole, provided that such conditions are reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right. Harris contends that the conditions in question are not reasonably related to his reintegration into society, are unconstitutionally vague and/or overbroad, and unduly infringe upon his rights of free speech and freedom of association under the First Amendment.[5] We now separately address the

---

5. In his Appellant's Brief, Harris also appears to argue that the conditions in question were invalid because they constituted "unusual conditions" for which he was not given advanced notice. To support this contention, which appears throughout his brief, Harris relies upon *U.S. v. Scott*, 316 F.3d 733, 737 (7th Cir.2003) (discussing Illinois law), explaining that a restriction on Internet access is an unusual condition, and upon Indiana Code Section 11–13–3–4(d), which provides: "The parole board may modify parole conditions if the parolee receives notice of that action and had ten (10) days after receipt of the notice to express the parolee's views on the proposed modification." In light of this statute, Harris maintains that, because he was only given advanced notice of the two conditions imposed by the trial court (i.e., that he register as a sex offender and receive treatment), the additional parole conditions imposed by the Board are invalid ex post facto conditions. This argument, however, misinterprets Indiana Code Section 11–13–3–4(d) and blurs the distinction between parole and probation. In Harris's prior appeal, another panel of this Court explained:

[P]arole is defined in relevant part as "[t]he release of a prisoner from imprisonment

before the full sentence has been served." In contrast, probation is defined as "[a] court-imposed criminal sentence that, subject to stated conditions, releases a convicted person into the community instead of sending the criminal to jail or prison." While the two terms have similar meanings, an important and relevant distinction is made in that " '[p]robation' relates to judicial action taken before the prison door is closed, whereas 'parole' relates to executive action taken after the door has closed on a convict."

*Harris v. State*, 762 N.E.2d 163, 167 (Ind.Ct. App.2002) (internal citations omitted), *reh'g denied, trans. denied.*

Here, the four conditions at issue were imposed by the Board in exchange for parole. These conditions were not modified by the Board and, thus, Indiana Code Section 11–13–3–4(d) is inapplicable to the present analysis. Moreover, because the conditions in dispute are parole stipulations, and not probationary conditions, it is irrelevant, for our purposes, that the trial court only required Harris to register as a sexual offender and undergo treatment.

propriety of each condition under Indiana Code Section 11–13–3–4(b).

### a. Internet Usage

■ As a condition of parole, the Board prohibited Harris from using "any computer with access to any 'on-line computer service' at any location (*including place of employment*) without the prior approval of [his] parole agent. This includes any Internet service provider, bulletin board system, e-mail system or any other public or private computer network." Appellant's App. at 50. Initially, we observe that this parole condition is not unreasonably vague, as it is "sufficiently clear to inform [Harris] of what conduct will result in his being returned to prison." *See Foster v. State*, 813 N.E.2d 1236, 1237 (Ind.Ct. App.2004) (quoting *Smith v. State*, 779 N.E.2d 111, 117 (Ind.Ct.App.2002), *trans. denied* ). Specifically, this condition makes the use of *any* computer that has access to the Internet, and for which prior approval by the parole agent has not been granted, a violation of Harris's parole, regardless of whether such computer is used for work-related or personal purposes.

Next, we note that the limitation on Harris's access to the Internet is reasonably related to his successful reintegration into the community. By imposing the restriction on Harris's use of the Internet, the Board was legitimately concerned that a released child molester's unfettered access to a computer might result in additional criminal conduct. This is so because the Internet, or Cyberspace, defies boundaries and offers unlimited access to people, including children. *See, e.g., U.S. v. Zinn*, 321 F.3d 1084, 1093 (11th Cir.2003) (noting that some child molesters reach their victims through the Internet), *cert. denied,*

540 U.S. 839, 124 S.Ct. 97, 157 L.Ed.2d 71 (2003). This access is often subtle to children—as it comes in the form of friendship or, in Harris's case, prospective employment—and undetected by parents. Restricting a child molester's access to this communication medium, therefore, serves to protect the public and to prevent future criminal activity.

In the case at bar, the record reveals that, while Harris did not use the Internet to facilitate the molestation for which he was convicted, he did groom the ten-year old victim for approximately five years. During that time, Harris acted as a "Big Brother" to the boy, providing him with toys, gifts, and friendship. Once Harris gained his victim's trust, however, Harris's actions became inappropriate. The evidence also demonstrates that Harris met his victim through a co-worker, i.e., the victim's mother.

Further, according to Harris's "Static 99 Assessment," [6] he is at a "medium-high level of risk to reoffend." Ex. B at 6. "Offenders who are categorized as medium-high risk are predicted to reoffend sexually at a rate of 26% within 5 years, 31% within 10 years, and 36% within 15 years." *Id.* Harris's individual risk of recidivism was rated even higher, however, because: (1) he is aroused to young males between the ages of seven and twenty-two years old; (2) his victim was unrelated and of the same gender as Harris; (3) he believes that his sexual relationship with the victim was beneficial to his victim; and (4) he has repeatedly ignored orders prohibiting him from seeing the victim. In light of these additional factors, Marc Roth of the Holy Cross Counseling Group believes that Harris is at "high risk" for recidivism, increas-

---

**6.** The Static 99 Assessment for sexual offender recidivism is a screening measure for use in settings that require routine assessments of adult sexual offender recidivism risk. Ex. B at 6.

ing the likelihood that he will reoffend sexually to a rate of "39% within 5 years, 45% within 10 years, and 52% within 15 years." *Id.* at 7. As a result of Harris's high risk for recidivism, in conjunction with the fact that the Internet offers unlimited, and often undetected, access to children, the restriction on Harris's use of the Internet is reasonably related to his successful and crime-free reintegration into society.

Moreover, we note that the condition in question does not completely prohibit Harris from using the Internet, which has increasingly become a vital means of communication in the business world. Instead, it simply requires him to receive prior approval from his parole agent to use the Internet. Indeed, here, Harris was permitted to use the Internet for his job at Lighthouse Video Productions.

■ Harris also contends that the restriction on his Internet usage violates his right to free speech and to freely associate with those of his choosing. *See, e.g., Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (recognizing that restrictions upon an individual's access to the Internet necessarily curtail First Amendment rights). A parolee's First Amendment rights, however, may be restricted to further the goals of parole, as long as such restriction is reasonably related to achieving those goals. *See United States v. Showalter,* 933 F.2d 573, 575 (7th Cir. 1991); *see also Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593. Because the restriction in question is reasonably related to the State's—and the Board's—goals of reintegrating Harris into his community, protecting the public at large, and preventing future crime, it does not unduly infringe upon his fundamental rights under the First Amendment.

### b. Unapproved Employment

■ The Board also restricted Harris from using his "employment as a means to acquire new victims." Appellant's App. at 51. The parole condition provides, in addition: "Your parole agent may contact your employer at any time. You will not work in certain occupations that involve being in the private residence of others, such as, but not limited to: door-to-door sales, soliciting, or delivery. Your parole agent must first approve any employment that you do engage in." This condition, like the one restricting his Internet usage, is not vague. Rather, it forbids Harris from engaging in certain types of employment, i.e., those that allow him to enter the private residences of others, and requires him to obtain approval of his employment from his parole agent.

In addition, because Harris is at high risk for re-offending sexually, the restriction on his employment is reasonably related to his successful reintegration into the community. Further, inasmuch as the parole condition in dispute does not ban Harris from obtaining employment, but rather merely requires him to seek prior approval for such employment, it is not unduly burdensome.

■ Nevertheless, Harris maintains that his employment at MLH Media—albeit unauthorized—is a conduit for his exercise of free expression. In particular, Harris argues that he intended for his artistic work, "Victims," to change societal mores about the act of molestation and, further, that, regardless of whether the Board agrees with his viewpoint, he has the right to express his opinions. As previously mentioned, however, the Board may restrict a parolee's First Amendment rights to further the goals of parole, as long as such restriction is reasonably related to achieving those goals. *See Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593. The

employment restriction in question is reasonably related to the goals of parole, which include reintegrating Harris into society, protecting the public, and preventing future crime. Accordingly, the condition does not unduly infringe upon Harris's fundamental rights under the First Amendment.

### c. *Enticing Children*

■ In granting Harris parole, the Board also imposed the following condition:

> You shall not possess any items on your person, in your vehicle, in your place of residence or as a part of your personal effects, that attract children, or that may be used to coerce children to engage in inappropriate or illegal sexual activities. You will not engage in any activities that could be construed as enticing children.

Appellant's App. at 51. In imposing this condition, however, the Board did not define the phrase "enticing children" or otherwise provide standards that would give a parolee of ordinary intelligence an opportunity to know what is prohibited. *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Because a parolee such as Harris has a due process right "to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison," we agree with Harris that this condition is unconstitutionally vague.[7] *Smith,* 779 N.E.2d at 118 (deciding issue in the probation context).

### d. *One Mailing Address*

■ Finally, as a condition of Harris's parole, the Board imposed the following restriction: "You shall have only one resi-dence and one mailing address at a time." Appellant's App. at 49. Contrary to Harris's contention, this condition is not vague—it requires Harris to maintain one residence and one mailing address at any given time. Because parole is a means of supervised release, this condition is reasonably related to the Board's obligation to supervise Harris and to helping Harris reintegrate into society. Because Harris is allowed to have a residence and mailing address, this restriction is not unduly restrictive of his right to receive mail or his right to conduct business.

### 2. *Propriety of the Conditions under Indiana Code Section 4–22–2–19.5*

■ Next, Harris challenges the validity of the conditions at issue under Indiana Code Section 4–22–2–19.5. Before we address the merits of this contention, we observe that, in the present case, the parties disagree as to whether Indiana Code Section 11–13–3–4 required the Board to promulgate the parole condition in dispute under Indiana Code 4–22–2. In particular, Harris argues that, under the plain and unambiguous language of Indiana Code Section 11–13–3–4, the Board was required to adopt the four conditions as rules under Indiana Code 4–22–2. The State counters that Indiana Code Section 11–13–3–4 merely authorizes, but does not require, the promulgation of parole conditions. Resolution of this issue requires us to utilize the tools of statutory construction, which provide, in pertinent part, that when a statute is unambiguous, a court must apply the plain and obvious meaning and not resort to other rules of construction. *See Brownsburg Area Patrons Affecting Change v. Baldwin,* 714 N.E.2d 135, 139

---

7. Because we find that this condition is void for vagueness, we do not address Harris's

other contentions with respect to "enticing children" condition.

(Ind.1999); *see also In re Estate of Bender*, 806 N.E.2d 59, 64 (Ind.Ct.App.2004). Additionally, the language employed in a statute is deemed to have been used intentionally. *Schafer v. Sellersburg Town Council*, 714 N.E.2d 212, 215 (Ind.Ct.App. 1999), *trans. denied.*

Indiana Code Section 11–13–3–4, which governs the Board's imposition of parole conditions, provides, in part:

 (a) A condition to remaining on parole is that the parolee not commit a crime during the period of parole.

 (b) The parole board may also adopt, under IC 4–22–2, additional conditions to remaining on parole and require a parolee to satisfy one (1) or more of these conditions. These conditions must be reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right.

* * * * *

 (e) As a condition of parole, the parole board may require the parolee to reside in a particular parole area. . . .

 (f) As a condition of parole, the parole board may require the parolee to:

  (1) periodically undergo a laboratory chemical test (as defined in IC 14–15–8–1) or series of tests to detect and confirm the presence of a controlled substance (as defined in IC 35–48–1–9); and

  (2) have the results of any test under this subsection reported to the parole board by the laboratory.

* * * * *

 (g) As a condition of parole, the parole board:

  (1) may require a parolee who is a sex and violent offender (as defined in IC 5–2–12–4) to:

   (A) participate in a treatment program for sex offenders approved by the parole board; and

   (B) avoid contact with any person who is less than sixteen (16) years of age unless the parolee:

    (i) receives the parole board's approval; or

    (ii) successfully completes the treatment program referred to in clause (A); and

  (2) shall:

   (A) require a parolee who is an offender (as defined in IC 5–2–12–4) to register with a sheriff (or the police chief of a consolidated city) under IC 5–2–12–5;

   (B) prohibit the offender from residing within one thousand (1,000) feet of school property (as defined in IC 35–41–1–24.7) for the period of parole, unless the offender obtains written approval from the parole board; and

   (C) prohibit a parolee who is an offender convicted of a sex offense (as defined in IC 35–38–2–2.5) from residing within one (1) mile of the victim of the offender's sex offense unless the offender obtains a waiver under IC 35–38–2–2.5.

By its plain and unambiguous language, this statute permits the Board to impose parole conditions, in addition to the mandatory and permissive parole conditions that are particularly described in subsections a, e, f, and g—provided that the Board adopt such conditions under Indiana Code 4–22–2. None of the four conditions at issue are specifically described in Indiana Code Section 11–13–3–4 and, thus, under subsection b, the Board was required to adopt them pursuant to Indiana Code 4–22–2.

That said, we note that, Indiana Code Section 4–22–2–19.5, which is the only section of Chapter 2 that Harris challenges,[8] provides:

> (a) To the extent possible, a rule adopted under this article or under IC 13–14–9.5 shall comply with the following:
>
> \* \* \* \* \*
>
> (2) Achieve the regulatory goal in the least restrictive manner.
>
> (3) Avoid duplicating standards found in state or federal laws.
>
> (4) Be written for ease of comprehension.
>
> (5) Have practicable enforcement.

Also relevant to the present analysis is Indiana Code Section 4–22–2–44, which invalidates any rule that is the subject of a non-complying rulemaking action.[9]

In the case at bar, Harris appears to argue that his parole conditions did not comply with Indiana Code Section 4–22–2–19.5 because they were not narrowly tailored to his "specific behavioral flaws and offensive behavior." Appellant's Reply Br. at 5. Specifically, he asserts that the conditions do not satisfy standards 2 through 5 of Indiana Code Section 4–22–2–19.5. In so arguing, however, Harris has failed to explain how the four parole conditions duplicate standards found in state or federal laws, are not written for ease of comprehension, and do not have practicable enforcement. Moreover, apart from making blanket, unsubstantiated, assertions that his parole conditions do not achieve the Board's regulatory goals in the least restrictive manner, Harris has failed to demonstrate cogently that the Board violated Indiana Code Section 4–22–2–19.5(a)(2) when it imposed the conditions at issue. As the petitioner for post-conviction relief, Harris bore the burden of establishing the grounds for relief by a preponderance of the evidence. *Weatherford,* 619 N.E.2d at 917. Because Harris has failed to show that the evidence before the post-conviction court led unerringly and unmistakably to a decision opposite that reached by the post-conviction court, we will not disturb the post-conviction court's decision on this basis.

## B. Procedural Mandates of Morrissey [10]

In *Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593, the United States Supreme Court

---

**8.** Harris does not assert that the parole stipulations in dispute were improper because the Board failed to follow the rulemaking procedures of Indiana Code 4–22–2. Indeed, we observe that, in conjunction with his parole, Harris executed the Conditional Parole Release Agreement, i.e., State Form 23R, Standard Parole Stipulations for Sex Offenders, i.e., State Form 49108 (4–00), and Special Parole Stipulations for Sex Offenders, i.e., State Form 49556 (4–00). These three documents are standardized forms that set forth the conditions of parole, including the stipulations in question. *See, e.g., Page v. State,* 517 N.E.2d 427, 429 (Ind.Ct.App.1988) (discussing a conditional parole release agreement and finding that it was validly adopted under Indiana Code Section 11–13–3–4), *trans. denied.* Accordingly, we will assume, for purposes of this appeal, that, in enacting the stipulations in question, the Board followed the rule-making procedures of Indiana Code 4–22–2, except for Indiana Code Section 4–22–2–19.5.

**9.** Indiana Code Section 4–22–2–44 provides, in part: "A rulemaking action that does not conform with this chapter is invalid, and a rule that is the subject of a noncomplying rulemaking action does not have the effect of law until it is adopted in conformity with this chapter."

**10.** Throughout his brief, Harris compares his status as a parolee to that of a criminal defendant. However, a parolee does not enjoy the same status as a criminal defendant, nor the same rights. *See, e.g., Piper v. State,* 770 N.E.2d 880, 882 (Ind.Ct.App.2002) (noting that, in the context of probation, a revocation

held that parolees charged with violations of parole are within the protection of the Due Process Clause of the Fourteenth Amendment. As such, parolees are entitled to a two-stage parole revocation procedure: (1) a "preliminary hearing" to determine whether there is probable cause to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions; and (2) a final revocation hearing prior to the final decision on revocation to consider whether the facts as determined warrant revocation. *Id.* at 485–488. The *Morrissey* Court determined that the minimum requirements of due process include written notice of the charges of parole violation, disclosure to the parolee of the evidence against him, an opportunity to be heard in person and to present evidence, the right to confront and cross-examine adverse witnesses, a "neutral and detached" hearing board, and a written statement by the fact-finders of the evidence relied upon and the reasons for revoking parole.[11] *Id.* at 489–90, 92 S.Ct. 2593.

Harris contends that, in revoking his parole, the Board "failed to identify a single reason for the decision to revoke and based [its] determinations on unsubstantiated hearsay." Appellant's Br. at 36. Our review of the Board's written findings of fact, however, reveals that the Board revoked Harris's parole because: (1) "Harris did not have permission from his parole agent to establish a website or e-mail address and he therefore failed to comply with his Special Stipulation [3;]" (2) his work with MLH Media was not authorized by the parole agent and, therefore, was in violation of Stipulation 12; and (3) Harris

did not have permission to use the post office box or e-mail address in violation of Special Standard Sex Offender Stipulation 3. Appellant's App. at 27–28. In light of these findings, we reject Harris's claim that he did not receive a written statement by the fact-finder disclosing the evidence relied upon and the reasons for revoking his parole.

■ Further, and with regard to Harris's contention that the Board improperly relied upon unsubstantiated hearsay, we note that Indiana Rule of Evidence 101(c)(2) provides, in pertinent part: "[t]he rules, other than those with respect to privileges, do not apply in ... [p]roceedings relating to ... sentencing, probation, or parole." Like probation, a parole revocation hearing is not to be equated with an adversarial criminal proceeding. *Cox v. State*, 706 N.E.2d 547, 550 (Ind.1999) (discussing probation) (citations omitted), *reh'g denied*. Rather, a revocation hearing is a narrow inquiry, and its procedures are more flexible than those of a criminal proceeding. *Id.* In particular, and in the absence of the Indiana Rules of Evidence, in parole revocation hearings, the Board may consider any relevant evidence, which bears some substantial indicia of reliability. *Black v. State*, 794 N.E.2d 561, 564 (Ind.Ct.App.2003) (in the context of probation).

■ Here, Harris argues that the Board improperly relied upon the parole agent's testimony regarding his communications with Patton (i.e., hearsay) when it determined that Harris had engaged in unapproved employment. However, be-

proceeding does not deprive a defendant of his absolute liberty, but only his conditional liberty, and, therefore, he or she is not entitled to the full due process rights afforded a defendant in a criminal proceeding), *trans. denied.*

11. These due process requirements for parolees have been codified by Indiana Code Sections 11–13–3–8, 11–13–3–9, and 11–13–3–10.

cause the Board also reviewed the letter from Harris to Patton, wherein Harris indicates that he is a casting director in search of a young co-writer for a project entitled "Victims"—the parole agent's hearsay testimony bore some substantial indicia of reliability. As such, the Board did not err by considering such testimony.[12] Accordingly, we will not reverse the post-conviction court's denial of Harris's petition for post-conviction relief on this basis.[13]

## C. Sufficiency of Evidence

■ In a related argument, Harris maintains that the evidence presented at the revocation hearing did not support the revocation of his parole under Indiana Code Section 11–13–3–10.[14] The Indiana Legislature has not established a burden of proof for parole-revocation hearings. *See* Ind.Code § 11–13–3–10. However, in *Hornaday v. State*, 639 N.E.2d 303, 312 (Ind.Ct.App.1994), *reh'g denied, trans. denied*, another panel of this Court determined that, while there are "distinguishing factors between probation and parole … [there is] no indication that revocation of parole should be more difficult or procedurally different than the revocation of probation."[15] (Citations and internal quotations omitted). Rather, once "the [Parole] Board has fulfilled [the statutory procedural] requirements, it has almost absolute discretion in making its decision." *Id.* (quoting *Hawkins v. Jenkins*, 268 Ind. 137, 374 N.E.2d 496, 500 (1978)).

Here, the evidence demonstrates that, during his period of parole, Harris maintained a website and e-mail address without his parole agent's approval, engaged in employment with MLH Media without his parole agent's approval, and simultaneously maintained a residence in New Paris, Indiana and a post office box in Syracuse, Indiana.[16] This evidence is sufficient to support the Board's revocation of Harris's parole and, thus, the post-conviction court did not err by denying the petition for post-conviction relief.[17]

12. Harris further contends that, because Patton was personally motivated to "black ball" him from the film industry, he should have been granted the opportunity to cross-examine her. Appellant's Br. at 38. We reject this contention and note that Harris had ample opportunity to cross-examine the parole agent regarding Patton's alleged bias. Moreover, even assuming that Harris should have been presented the opportunity to cross-examine Patton, the error was harmless in light of the letter, wherein Harris admitted that he was acting as a casting director for MLH Media.

13. Harris further contends that the Board violated his procedural rights when it accepted prejudicial ex parte testimony and lost material that had been presented at the preliminary hearing. In so arguing, however, Harris fails to explain the allegedly ex parte communication or misplaced material. Accordingly, we do not examine these claims of error.

14. Indiana Code Section 11–13–3–10(c) provides:

If it is determined that the parolee did violate parole, the parole board may contin-

ue parole, with or without modifying the conditions, or revoke the parole and order the parolee imprisoned on either a continuous or intermittent basis. If, however, the violation is the commission of a new felony, the parole board shall revoke the parole and order continuous imprisonment.

15. The burden of proof in a probation-revocation hearing is by preponderance of the evidence. Ind.Code § 35–38–2–3(e).

16. We agree with Harris that his e-mail address does not constitute a separate residence or mailing address under Special Standard Sex Offender Stipulation 3, but rather is in violation of the condition restricting his use of the Internet.

17. Harris also argues that the Board erred by ignoring his evidence that he did not violate the conditions at issue. However, on appeal, we will not reweigh the evidence or assess the credibility of witnesses.

### D. Earned Credit Time

Lastly, Harris argues that the parole revocation improperly deprived him of his earned credit time. The record indicates that Harris earned good time credit, pursuant to Indiana Code Sections 35–50–6–3(a) [18] and 35–50–6–3.3(a), –3.3(d), and –3.3(i),[19] and was paroled on November 6, 2002, after serving only three and one-half years of his ten-year sentence. However, his early release does not mean that Harris had completed his sentence and was entitled to discharge. *See Page*, 517 N.E.2d at 429. Rather, the credit time statutes are only applied to determine when felons are eligible for parole. *Id.* While on parole, the parolee remains in legal custody because, although parole is an amelioration of punishment it is, in legal effect, still imprisonment. *Id.* Indeed, Indiana Code Section 35–50–6–1(b) provides that "a person released on parole remains on parole from the date of his release until his fixed term expires, unless his parole is revoked or he is discharged from that term by the parole board." Although Harris received parole in 2002, his fixed term will not expire until April 29, 2009. Therefore, Harris's parole revocation was not unlawful on this basis.[20]

**18.** Indiana Code Section 35–50–6–3(a) provides: "A person assigned to Class I earns one (1) day of credit time for each day he is imprisoned for a crime or confined awaiting trial or sentencing." Indiana Code Section 35–50–6–4 provides that "[a] person imprisoned for a crime or imprisoned awaiting trial or sentencing is initially assigned to Class I." That person may be reassigned to Class II or Class III if he or she violates a rule imposed by the Department of Correction; a rule of the penal facility in which he or she is imprisoned; or a rule or condition of a community transition program. *See* Ind.Code § 35–50–6–4. Because the record before us does not demonstrate that Harris violated any rules imposed by the Indiana Department of Correction, the penal facility, or a community transition program, we presume that he was a Class I prisoner.

**19.** Indiana Code Section 35–50–6–3.3 provides, in relevant part:

(a) In addition to any credit time a person earns under subsection (b) or section 3 of this chapter, a person earns credit time if the person:
(1) is in credit Class I;
(2) has demonstrated a pattern consistent with rehabilitation; and
(3) successfully completes requirements to obtain one (1) of the following:
\* \* \* \* \*
(C) An associate's degree from an approved institution of higher learning (as defined under IC 20–12–21–3).
(D) A bachelor's degree from an approved institution of higher learning (as defined under IC 20–12–21–3).

\* \* \* \* \*

(d) The amount of credit time a person may earn under this section is the following:
\* \* \* \* \*
(3) One (1) year for completion of an associate's degree.
(4) Two (2) years for completion of a bachelor's degree.
\* \* \* \* \*
(i) The maximum amount of credit time a person may earn under this section is the lesser of:
(1) four (4) years; or
(2) one-third (1/3) of the person's total applicable credit time.

**20.** In light of the analysis in Part III.D, we wholly reject Harris's contention that the revocation of his parole subjected him to double jeopardy under the United States Constitution. In *Kincaid v. State*, 757 N.E.2d 713, 716 (Ind.Ct.App.2001), *vacated on other grounds by* 778 N.E.2d 789 (Ind.2002), *reh'g denied, cert. denied* 540 U.S. 818, 124 S.Ct. 84, 157 L.Ed.2d 35 (2003), for example, another panel of this Court held that "a violation of a condition of probation does not constitute an offense within the purview of double jeopardy analysis." In so doing, the *Kincaid* court noted that "[t]his conclusion derives from the fact that revocation proceedings may be based upon violations of probation conditions rather than upon the commission of a crime, and the finding of whether a defendant has complied with these conditions is a question of fact and not an adjudication of guilt." *Id.* The same holds true for parole revocation proceedings.

Moreover, we note that the revocation of Harris's parole did not deprive him of his

For the foregoing reasons, we affirm the post-conviction court's denial of Harris's petition for post-conviction relief.

Affirmed.

SHARPNACK, J., and DARDEN, J., concur.

earned credit time under Indiana Code Section 35–50–6–5. That statute provides:

(a) A person may, with respect to the same transaction, be deprived of any part of the credit time he has earned for any of the following:

(1) A violation of one (1) or more rules of the department of correction.

(2) If the person is not committed to the department, a violation of one (1) or more rules of the penal facility in which the person is imprisoned.

(3) A violation of one (1) or more rules or conditions of a community transition program.

(4) If a court determines that a civil claim brought by the person in a state or an administrative court is frivolous, unreasonable, or groundless.

*However, the violation of a condition of parole or probation may not be the basis for deprivation.* Whenever a person is deprived of credit time, he may also be reassigned to Class II or Class III.

(b) Before a person may be deprived of earned credit time, the person must be granted a hearing to determine his guilt or innocence and, if found guilty, whether deprivation of earned credit time is an appropriate disciplinary action for the violation. In connection with the hearing, the person is entitled to the procedural safeguards listed in section 4(c) of this chapter. The person may waive his right to the hearing.

(c) Any part of the credit time of which a person is deprived under this section may be restored.

(Emphasis added).

Here, Harris earned and *received* good time credit. However, after earning this time and receiving the privilege of parole, Harris violated the terms of his parole and the remainder of his fixed term was reinstated pursuant to Indiana Code Section 35–50–6–1(c). *See, e.g., Boyd v. Broglin,* 519 N.E.2d 541, 543 (Ind.1988) (noting that the defendant received the benefit of his earned credit time when he was released to parole and he was not, therefore, deprived of his earned credit time), *reh'g denied.*