Paul KOMYATTI, Appellant–Petitioner,

v.

STATE of Indiana, Appellee–Respondent.

No. 52A04–1002–MI–74.

Court of Appeals of Indiana.

July 28, 2010.

Paul Komyatti, Bunker Hill, IN, Appellant Pro Se.

Gregory F. Zoeller, Attorney General of Indiana, Kathy Bradley, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Paul Komyatti, Jr., appeals the denial of his petition for post-conviction relief ("PCR petition"), which challenged the revocation of his parole. We affirm.

### Issues

Komyatti raises a number of issues, which we combine and restate as:

I. whether various alleged procedural missteps require reversal of his parole revocation;

II. whether there is sufficient evidence to support the revocation of his parole; and

III. whether the revocation of his parole deprived him of earned credit time.

### Facts

On December 28, 1983, Komyatti was sentenced to a fifty-five-year term for murder. Komyatti was released to parole on May 14, 2009; he took up residence in Indianapolis. Among the conditions of Komyatti's parole was that he comply with all laws and regulations governing the use of motor vehicles, which was Rule 4(b) of his parole agreement, and that he receive permission from his parole agent before traveling outside of his parole district for frequent or prolonged periods of time, which was Rule 3(b) of the agreement.[1]

On July 13, 2009, parole agent Mike Degraw and United States Marshal Jim Truitt spoke to Komyatti at his home about an allegation that he had violated parole conditions. Komyatti waived his *Miranda* rights and told Degraw and Truitt that, on July 10, 2009, he had driven alone to Michigan City to visit a casino in a car belonging to another person, even though Komyatti only had a learner's permit and not a valid driver's license; Komyatti returned to Indianapolis in the early morning hours of July 11, 2009. On July 13, the Indiana Parole Board ("the Board") issued a parole violation warrant for Komyatti.

On July 14, 2009, Komyatti again was interviewed at his home. This time, Komyatti said that Steven Ellis had driven him to Michigan City. After this interview, Komyatti was taken into custody on the parole violation warrant. He also received a notice of preliminary hearing for the violation, which alleged that he had violated Rules 3(a) and 4(b) of his parole agreement.[2] Komyatti waived his right to sev-

---

1. Both the State and the post-conviction court characterize section 3(b) as prohibiting any travel outside of Komyattis parole district unless he first received permission from his parole agent. In fact, this section only states that Komyatti agreed "to consult with my supervising officer if personal needs or employment requires frequent or prolonged periods beyond the parole district or area to which I am released." Appellees App. p. 20. This is considerably different than limiting *any* travel outside the district.

2. Rule 3(a) prohibits out-of-state travel by a parolee without the written consent of the Department of Parole. This reference to Rule 3(a) clearly was incorrect, as all other references in the record are to Komyatti allegedly violating Rule 3(b).

enty-two hour notice of the preliminary hearing, and it was held on that same day. Komyatti pled not guilty to the allegations, but the hearing officer found that probable cause existed for both violations. Komyatti was informed that a final hearing would be held within sixty days. No separate written findings of fact were issued after the preliminary hearing.

Komyatti then was transported to the Plainfield Correctional Facility while awaiting a final hearing. On August 11, 2009, Department of Correction employee Justin Bennett delivered a notice of parole violation final hearing to Komyatti. Komyatti refused to accept or sign the notice, and it was placed with his property. The notice informed Komyatti that the final hearing would take place on August 13, 2009 and that he was alleged to have violated Rules 3(b) and 4(b) of his parole agreement. The notice also informed Komyatti of his rights at the hearing, and that he could request, and the Board would grant, a 30–day continuance of the hearing for any reason.

Komyatti appeared at the hearing before the Board on August 13, 2009, in full shackles. He was accompanied by his attorney and two witnesses, Ellis and Komyatti's girlfriend, Jenny Sterling. At the beginning of the hearing, Komyatti affirmed that he had received notice of the hearing and that he was ready to proceed; he did not request a continuance. Before receiving evidence, Board Vice–Chairman Randy Gentry told Komyatti that the Board would not consider the alleged violation of Rule 3(b) and would only consider the alleged violation of Rule 4(b), i.e. driving without a license. Komyatti testified that he had first said he had driven alone to Michigan City because he did not want to reveal that he had been with Ellis, who is a convicted felon. He also stated that on July 14, 2009, Degraw and a different

U.S. Marshal, Ryan Harmon, told Komyatti that they had seen a parking lot surveillance videotape from the casino in Michigan City that revealed Ellis driving a car, different from the one Komyatti originally said he had driven, in which Komyatti was a passenger. Ellis and Sterling also testified that Ellis had driven Komyatti to Michigan City. When called to testify, however, Degraw denied seeing any videotape of Ellis driving a vehicle in the casino parking lot in which Komyatti was a passenger. Harmon was not present at the hearing. Gentry also stated that the Board had no videotape in its possession.

After the hearing, the Board determined that Komyatti had violated Rule 4(b) of his parole agreement, revoked his parole, and ordered him to return to prison. It issued written findings regarding that violation. Komyatti, however, did not immediately receive these findings. On September 9, 2009, Komyatti filed a PCR petition challenging his parole revocation. On November 3, 2009, the State filed a motion for summary disposition. Included with this motion were various exhibits, including a DVD of the final revocation hearing and the Board's findings of fact in support of Komyatti's parole revocation. After a hearing, the post-conviction court granted the State's motion for summary disposition on November 20, 2009. Komyatti now appeals pro se.

### Analysis

We review the grant of a motion for summary disposition in post-conviction proceedings on appeal in the same way as a civil motion for summary judgment. *Norris v. State*, 896 N.E.2d 1149, 1151 (Ind.2008). Summary disposition, like summary judgment, is a matter for appellate de novo review when the determinative issue is a matter of law, not fact. *Id.* Summary disposition should be granted only if "there is no genuine issue of materi-

al fact and the moving party is entitled to judgment as a matter of law." Ind. Post–Conviction Rule 1(4)(g). "We must resolve all doubts about facts, and the inferences to be drawn from the facts, in the non-movant's favor." *Allen v. State,* 791 N.E.2d 748, 753 (Ind.Ct.App.2003), *trans. denied.*

### I. Alleged Procedural Errors

■ Komyatti makes a number of arguments regarding alleged procedural missteps in his parole revocation proceedings. As a general rule, defendants facing potential parole revocation are entitled to a number of procedural due process rights, which include: written notice of the parole violation charges; disclosure of the evidence against the parolee; an opportunity to be heard in person and to present evidence; the right to confront and cross-examine adverse witnesses; a "neutral and detached" parole hearing board; and a written statement by the board of the evidence relied upon and the reasons for revoking parole. *Harris v. State,* 836 N.E.2d 267, 280 (Ind.Ct.App.2005) (citing *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972)), *trans. denied.* Parolees also are entitled to a two-stage revocation procedure: (1) a preliminary hearing to determine whether there is probable cause to believe that the parolee has committed acts that would constitute a violation of parole conditions; and (2) a final revocation hearing prior to the final decision on revocation to consider whether the facts as determined warrant revocation. *Id.*

■ By and large, these constitutional requirements have been embodied in the Indiana Code. Komyatti argues that several of these statutory provisions were violat-ed in his case. We fail to find definitive indications that these provisions were violated. Even if some provisions were not followed to the letter, reversal of Komyatti's parole revocation is not required. As we review Komyatti's claims, we keep in mind that "[w]here the purpose and intent of a statutory mandate are satisfied, this court will not reverse for mere technical procedural errors unless the defendant can show that he was harmed or prejudiced by such errors." *Kindred v. State,* 173 Ind. App. 624, 629, 365 N.E.2d 776, 779 (1977).

■ Komyatti contends the Board erred when it did not provide him, after the preliminary hearing, with written findings of fact and a statement of the evidence relied upon in finding there was probable cause he violated parole. Indiana Code Section 11–13–3–9(a)(4) does require such findings,[3] and it does not appear that Komyatti received anything resembling such findings until after his parole was finally revoked and he filed his PCR petition. We would observe that this findings requirement after the preliminary hearing would seem to serve the purpose of alerting a parolee of the nature of the allegations and evidence against him or her regarding an alleged parole violation in order to prepare a defense; as such, we could see the potential for prejudice if a parolee does not receive the preliminary hearing findings until after the final revocation hearing. Here, however, there never has been any doubt as to the nature of the evidence regarding Komyattis parole violation. It has, from the beginning, been based almost entirely upon Komyattis admission on July 13, 2009, that he had driven a car to Michigan City on July 10, 2009, while only having a learners permit.

---

**3.** It is unclear whether due process requires such findings at the preliminary hearing stage.

We do not see that the failure to timely provide Komyatti with the preliminary hearing findings resulted in any prejudice in this case.

■ Komyatti also contends the notice he received for the final revocation hearing was inadequate in several respects. Indiana Code Section 11–13–3–8(e) governs required notices for revocation hearings and states:

the parolee shall be given written notice of:

(1) the date, time, and place of the hearing;

(2) the condition alleged to have been violated;

(3) the procedures and rights applicable to that hearing; and

(4) the possible sanctions if a violation is found.

The notice here informed Komyatti that he was alleged to have violated Rules 3(b) and 4(b) of his parole agreement; the text of those rules was printed on the reverse side of the notice. It informed Komyatti that the Board could require him to serve the time remaining on his sentence if it found he violated parole, i.e. the most severe sanction that could be imposed. It advised Komyatti of the date of the hearing, that he could speak on his own behalf, present evidence and call witnesses, cross-examine adverse witnesses, and that he would receive written notice of the Board's decision. The notice apparently did not advise Komyatti of the time and place of the hearing, but obviously he showed up at the appointed time and place and also managed to procure the attendance of two witnesses. Any deficiencies in the notice, again, do not appear to have prejudiced Komyatti.[4]

Komyatti also asserts that he was improperly denied access to legal research materials as he was held in the Plainfield Correctional Facility awaiting his revocation hearing. We observe that Komyatti made no mention of this allegation during the revocation hearing, even though he was asked if he was prepared to proceed. Additionally, the hearing notice explicitly advised Komyatti that he was entitled to one automatic thirty-day continuance of the hearing. If Komyatti felt he was unprepared for the hearing for any reason, he should have availed himself of the continuance opportunity. He did not do so.

■ Komyatti also contends that it was unfairly prejudicial to him to have to appear before the Board fully shackled. He seems to base this contention on the general proposition that "a criminal defendant cannot be forced to appear in either jail clothing or shackles during the guilt or penalty phase of trial without an individualized finding that the defendant presents a risk of escape, violence, or disruption of the trial." *Ritchie v. State,* 875 N.E.2d 706, 718 (Ind.2007). However, he fails to cite any authority for the proposition that this general rule should be extended to proceedings before a parole board. Rather, the rule applies to courtroom proceedings in front of a jury. *Id.; see also French v. State,* 778 N.E.2d 816, 820 (Ind. 2002) (stating the rule that a defendant generally "has the right to appear in front of a jury without physical restraints. . . ."). In the absence of any cogent argument to the contrary, we decline to extend the rule regarding shackling of a defendant to proceedings before a parole board.

■■ Next, we address Komyatti's argument that he was denied a hearing before an impartial, neutral, and detached

---

4. Komyatti also complains that he did not receive forty-eight hours notice of the final

hearing. The statute makes no mention of a time limit for the notice.

decisionmaker. He specifically attacks comments made by Board Vice–Chairman Gentry during the hearing, who was aggressive in questioning Komyatti about his change in story on whether or not he drove to Michigan City and essentially called Komyatti a liar. We note that members of a parole board are not required by due process to be judges or even lawyers. *See Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604. As such, conduct that might be questionable in a judge would not necessarily be so for a parole board member.

▆▆▆ Generally, to show improper bias or prejudice in a decisionmaker, a defendant must demonstrate a personal bias against him or her that stems from a source separate from the evidence and argument presented at the proceedings. *See Bahm v. State,* 789 N.E.2d 50, 54 (Ind.Ct. App.2003), *aff'd on r'hg, trans. denied.* Adverse rulings against a defendant do not indicate a personal bias that calls impartiality into question. *See id.* Here, although Gentry used strong language in attacking Komyatti's credibility, that attack was based purely on the evidence in the record, namely Komyatti's two diametrically opposed versions of what occurred on July 10, 2009. Gentry's decision to believe Komyatti was telling the truth the first time he spoke to the authorities, i.e. that he drove himself to Michigan City, does not indicate improper bias or prejudice. Komyatti has not demonstrated that the Board, or Gentry specifically, was not a neutral, detached, and impartial decisionmaker.

▆▆▆ Komyatti contends he was entitled to two separate final revocation hearings: one to determine whether he had violated any conditions of his parole, and a second, later hearing to determine whether any such violation warranted revocation. *Morrissey* makes no mention of such a requirement. It only establishes that a parolee facing revocation is entitled to (1) a preliminary hearing and (2) a final hearing that "must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Morrissey,* 408 U.S. at 488, 92 S.Ct. at 2603. Komyatti received two such hearings; there was no need for a third.

▆▆▆ Next, we consider Komyatti's contention that the Board erred in failing to provide him with a copy of the purported casino parking lot surveillance videotape, which he claims would have supported his argument that Ellis had driven him to Michigan City. The Board, however, did not have this videotape in its possession and did not consider it in ruling on the parole revocation. The Board only was obligated to disclose the evidence *against* Komyatti that it considered, and it did so. *See Harris,* 836 N.E.2d at 280.

We acknowledge that some federal courts have suggested that convicted felons facing revocation of parole or similar early release arrangements *may* have a right to the assistance of a court (or other body) in obtaining exculpatory evidence for use in a revocation hearing. *See United States v. Neal,* 512 F.3d 427, 437 n. 10 (citing *United States v. Dixon,* 187 F.Supp.2d 601, 604 (S.D.W.Va.2002)). This would appear to be more directly what Komyatti is arguing. He asserts that before the revocation hearing, he requested the Board's assistance in obtaining the videotape. Cases such as *Neal,* however, make it plain that a request for assistance to obtain allegedly exculpatory evidence must be timely. *See id.* at 437–38. Here, even if Komyatti had requested assistance in obtaining the videotape in advance of the final hearing, he never mentioned that request at the hearing itself, but instead told the Board he was

ready to proceed. He also never requested a continuance in order to have more time to attempt to locate the videotape. Under the circumstances, we cannot say Komyatti has established error in the Board's failure to attempt to procure the allegedly exculpatory videotape. *See id.*

 The final argument we address under the umbrella of procedural due process is Komyatti's claim that he did not receive written findings related to the Board's final decision to revoke his parole. It is true that he did not receive them for some time after the final hearing and revocation. He did, however, receive a copy of the findings after he filed his PCR petition. Thus, they were available for the PCR court to review, and for this court to review on appeal. "The purposes of the written statement requirement are to help insure accurate factfinding with respect to any alleged violation and to provide an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence.'" *Medicus v. State,* 664 N.E.2d 1163, 1164 (Ind.1996) (quoting *Black v. Romano,* 471 U.S. 606, 613–14, 105 S.Ct. 2254, 2258–59, 85 L.Ed.2d 636 (1985)). Although the findings arguably could have been provided to Komyatti in a more timely manner, that alone is not sufficient to require reversal of his parole revocation. The findings exist, and they are adequate to allow intelligent review of the Board's decision.

## II. Sufficiency of Evidence

 We now turn to whether there is sufficient evidence to support the Board's revocation of Komyatti's parole. We note that "'[O]nce the [Parole] Board has fulfilled [the statutory procedural] requirements, it has almost absolute discretion in making its decision....'" *Hornaday v. State,* 639 N.E.2d 303, 309 n. 10 (Ind.Ct.App.1994) (quoting *Hawkins v.*

*Jenkins,* 268 Ind. 137, 143, 374 N.E.2d 496, 500 (1978)), *trans. denied.* We will consider only the evidence most favorable to the revocation and will not reweigh the evidence or judge the credibility of the witnesses. *See Podlusky v. State,* 839 N.E.2d 198, 200 (Ind.Ct.App.2005) (addressing probation revocation).

The Board's written findings are partially a boilerplate form, which indicates that it relied upon the following evidence: "Parole Release Agreement; PV Report; Initial Hearing; Preliminary Hearing Waiver; Preliminary Hearing Minutes; New Conviction; Alcohol Test Results; Drug Test Results; Plea; Other." Appellee's App. p. 37. Obviously, much of this purported "evidence" did not exist in Komyatti's case. For example, there were no alcohol or drug test results and no new conviction for Komyatti. Indiscriminate use of this form has previously caused problems for the Board. We have reversed a parole revocation where the Board used this form, but the form failed to indicate that the Board relied on a piece of evidence that the State on appeal claimed supported the parole revocation. *See Pierce v. Martin,* 882 N.E.2d 734, 737–38 (Ind.Ct.App.2008).

Here, however, it does appear that the Board did in fact rely upon the probation violation report, or "PV Report," in revoking Komyatti's parole. The contents of that report are related in the Board's findings and include Komyatti's admission to driving without a driver's license, in violation of Rule 4(b) of his parole release agreement. To the extent the Board's findings refer to other evidence that in fact was not before it, the references to that evidence are mere surplusage and do not warrant reversal. *Cf. CSL Cmty. Ass'n, Inc. v. Jennings Nw. Reg'l Utils.,* 794 N.E.2d 567, 569 (Ind.Ct.App.2003) (noting that even erroneous special findings do not warrant reversal if they amount to mere

surplusage), *trans. denied.* Nevertheless, we explicitly discourage the Board from continuing to use this boilerplate form or, if it is to be used, it must be individually tailored to each case to accurately reflect what evidence was actually presented and considered at the parole revocation hearing. Not to do so invites confusion and escalates the chance of reversal.

The remainder of Komyatti's attack on the sufficiency of the evidence is a request that we reweigh evidence and judge the credibility of the witnesses who were before the Board. We cannot do so. Despite Komyatti's claim that Ellis drove him to Michigan City and that there exists a videotape that would support that claim, the fact remains that he initially told his parole agent and a U.S. Marshal that he drove by himself to Michigan City. It was entirely within the Board's province to decide whether to believe what Komyatti first said, or his subsequent retraction. It believed Komyatti told the truth the first time, and we cannot second-guess that determination.

### III. Credit Time

 Komyatti's final argument is that the revocation of his parole improperly deprived him of good time credit he earned during his previous period of incarceration. Specifically, he seems to contend that once he earned credit time while incarcerated, he could not be ordered back to prison to serve up to the remainder of his original sentence upon revocation of his parole. This court addressed and rejected a similar argument in *Harris.*

Indiana Code Section 35–50–6–3(a) provides that a prisoner assigned to Class I (i.e., a prisoner who complies with Department of Correction rules) earns one day of credit time for each day of confinement. Komyatti was sentenced in 1983 to a fifty-five year term and was released to parole in 2009 after serving roughly half of that term and accumulating credit time. However, Komyatti's release from prison in 2009 did not mean that he completed his sentence and was entitled to discharge. *See Harris,* 836 N.E.2d at 282. "Rather, the credit time statutes are only applied to determine when felons are eligible for parole. While on parole, the parolee remains in legal custody because, although parole is an amelioration of punishment it is, in legal effect, still imprisonment." *Id.* (citation omitted). Thus, Komyatti's good behavior while incarcerated entitled him to be released back into society, albeit on parole, after serving only half of his original sentence. But having violated parole, it is entirely legal to send him back to prison to serve up to the remainder of his fifty-five year term, or approximately twenty-seven and one-half years, though he will again accumulate credit time while serving that time. *See* I.C. § 35–50–6–1(c).[5]

Komyatti also claims in his brief that when he was convicted and sentenced in 1983, the parole statute limited the time he could be ordered to serve after revocation of parole to one year. He asserts the statute was amended in 1994, and it is an ex post facto violation to apply the new version of the statute to him and permit the Board to require him to serve the remainder of his fixed term. We see no such language in the pre–1994 version of the statute. In fact, the statute used to read, "A person whose parole is revoked shall be imprisoned for the remainder of his fixed term." I.C. § 35–50–6–1 (1993).

5. The Board, however, "may reinstate the person on parole at any time after the revocation." I.C. § 35–50–6–1(c). The Board is scheduled to consider whether Komyatti should be released early back to parole in August 2010. If he is not released early, his earliest release from his present incarceration after earning credit time would be in 2023.

It now reads, "A person whose parole is revoked shall be imprisoned for all or part of the remainder of the person's fixed term." I.C. § 35–50–6–1 (2010). If anything, the parole statute is now more lenient in this regard, not less lenient. There is no ex post facto limitation regarding the amount of time Komyatti may be ordered to serve following his parole revocation.

### Conclusion

We conclude that there are no genuine questions of fact with respect to Komyatti's PCR petition and that the State was entitled to judgment as a matter of law. The trial court correctly granted the State's motion for summary disposition.

Affirmed.

BAILEY, J., and MAY, J., concur.